# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
### *Norfolk Division*

**UNITED STATES OF AMERICA**

   **v.**           **Case No. 2:24CR25**

**MICHAEL MACARTNEY,**

   **Defendant.**

**POSITION OF DEFENDANT WITH RESPECT TO SENTENCING FACTORS**

   COMES NOW the Defendant, Michael Macartney ("Mr. Macartney"), by counsel, pursuant to Section 6A1.2 of the *Sentencing Guidelines and Policy Statements*, and this Court's Sentencing Order, and submits his position with respect to the sentencing factors. Mr. Macartney has no objections to the Pre-Sentence Report ("PSR") that effect the advisory guidelines.

## The Sentence Requested

   Mr. Macartney is before this Court for sentencing after pleading guilty on April 30, 2024, pursuant to a plea agreement, to one count, charging him with Conspiracy to Create and Distribute Animal Crushing Videos, in violation of 18 U.S.C. §§ 371 and 48(a)(2) and 48(a)(3).). Sentencing is scheduled for October 1, 2024. The statutory range of imprisonment is zero to 5 years.

   The total offense level is 18, and Mr. Macartney falls under Criminal History Category III, yielding a guideline range of 33 to 41 months. The defense asserts that a downward variance from the applicable guideline range is appropriate based on his history and characteristics, his post offense rehabilitation, and cooperation with animal

rights investigators. These considerations, along with the other sentencing factors discussed herein, strongly suggest that a ***sentence of three years' probation, to include a period of home detention with electronic monitoring and 200 hours of community service***, is sufficient but not greater than necessary to achieve the goals of sentencing.

<u>**The History and Characteristics of Mr. Macartney**</u>

In many ways, the story of Mr. Macartney's life reads much like a graphic novel, with seasons of great failures, significant achievements and often behaviors that are difficult to explain.   He was raised in the home of an abusive, alcoholic father, where violence was a seemingly normal and daily activity.  His mom was a fighter and removed Mr. Macartney out of the home when he was around three years old, but he still remembers the violence.  From the turmoil of this setting, he and his mother moved into his grandmother's home where he was raised in loving environment.  Mr. Macartney met the love of his life Jeanie when they were both teenagers and they have been together more than 30 years and married since 1995. [1]

 

---

[1]  Exhibit 2

In his mid-20's Mr. Macartney's life took a different turn as he began a long a destructive relationship with substance abuse.  While on this road, Mr. Macartney joined the Monguls biker gang, which was known for its involvement with illegal drugs and various criminal activities.  His addiction also led him to a CVS in Upstate New York where he passed a note to a pharmacy employee demanding prescription drugs- the very drugs that he was addicted to. Mr. Macartney wasn't armed nor was anyone hurt. He took the drugs and walked out of the store without incident.  Mr. Macartney was arrested and pled guilty to 3rd degree robbery. ECF 21 at 10. However, like many who suffer from addiction, Mr. Macartney's time in prison did result in recovery from substance abuse. However, this sobriety was short lived as he relapsed less than a year after his release in 2015.

After Mr. Macartney's release in August 2015, he relocated to Florida with his wife. The two lived together on a property owned by a man named Phil, Mr. Macartney's friend. One day Phil gave Mr. Macartney a pill for a headache. Exhibit 1 at 11. The pill turned out to be an opioid which caused Mr. Macartney to spiral again. Id. Even though Mr. Macartney and his wife moved from Florida to Virginia, the drug use persisted and progressed to heroin use. Id. at 12.

Despite his extensive drug use during this period of relapse, Mr. Macartney did not incur any new criminal charges until June 2021 when he caused an accident while driving under the influence of heroin. ECF 21 at 10-11. The June 2021 accident served as a surreal turning point for Mr. Macartney.  While he didn't remember causing the

3

accident, the very first thing Mr. Macartney wanted to know was whether he injured anyone in the crash. Exhibit 1 at 9. He was extremely relieved that no one was hurt and vowed to remain substance free moving forward. Id. Mr. Macartney was immediately contrite, and that contrition served as one of the main impetuses for his sobriety. There is not a day that goes by where he does not think about the car crash he caused. Id at 12.

Mr. Macartney has maintained his sobriety to this day.[2] The decision to be sober was initially Mr. Macartney's, however there have been other factors that contributed to his sobriety. Mr. Macartney pled guilty to Driving Under the Influence, and as a result was ordered to participate in an Intensive Opioid Recovery program. Id at 4. Mr. Macartney has learned a plethora of positive coping skills that he employs daily since he began the program and successfully completed the court ordered treatment. Even though Mr. Macartney successfully completed the terms of his state probation in October 2023, he continued to attend substance abuse treatment. Mr. Macartney's sobriety is so important to him and his family that he has supplemented treatment with attendance at Narcotics Anonymous meetings on his own volition. Id at 12.

Mr. Macartney also has an extremely strong support system. He currently lives with his wife in a small apartment near his mother's home Mr. Macartney characterizes the relationship between him and his mother as "really strong, even to this day." Id at 5. His mother was his primary caretaker and lived with her through the majority of his childhood. Mr. Macartney recognized that his mother did all she could to provide for the

---

[2] Exhibit 11

two of them even though they lived in poverty. Id at 6. She has continued to be a foundational source of support for Mr. Macartney through both his addictions and legal woes.

Mr. Macartney's wife, Jean, also serves as a main pillar of support for him. As mentioned above, they have been together since high school. [3]Jean truly embodies the concept of unconditional love. She has stood by and continued to support him at every point in Mr. Macartney's life. It is a love that Mr. Macartney needs and deeply appreciates, especially on his journey to sobriety. In addition, although he grew up without his father in the home, Mr. Macartney has since reconciled with his father and they have become close friends.  They speak on a daily basis and share their love for collecting and trading baseball cards.

While he is not justifying his conduct in any shape or form, it is important for this Court to understand the basis for Mr. Macartney's actions. Simply put, Mr. Macartney is a self-proclaimed hustler. It has been a prominent point of Mr. Macartney's understanding of himself. This mentality began in his youth. As discussed throughout his psychological evaluation and his Social History, Mr. Macartney grew up in an abusive household and impoverished area of Rochester, NY. The 19th Ward, where Mr. Macartney lived "was a hotbed for gang violence".  This combination of financial instability and prevalent violence both within and outside the home caused Mr. Macartney to experience stress, anxiety, and fear of rejection at an early age. To cope with

---

[3] Exhibit 2

these feelings, Mr. Macartney would hyperfocus on the things he wanted. Exhibit 1 at 13. This coping mechanism is the inception of his hustler's spirit.

To Mr. Macartney, being a hustler did not involve any criminality. He would trade baseball cards or even play a game of basketball for the latest jersey. Id. When Mr. Macartney hustled to get the things he wanted, the things that his mother could not provide for himself, he experienced a sense of euphoria and a boost in his self-esteem. Hustling involved innocuous activity for Mr. Macartney and never rose to the level of criminal activity until this instant matter. When Mr. Macartney was hustling to gain money from the videos he sold, he did not realize he was doing anything wrong. Id at 14. He would find the videos from a public internet source such as YouTube, not the dark web. Because Mr. Macartney's past experiences with hustling were always of the legal ilk, it never crossed his mind that it may have been illegal to sell the videos. Id at 15. He just knew that he wanted to make money, and the gratification he received was the motivation to continue to hustle and sell these videos. (*See BBC Video* 3 at 17:50 – 18:10.)[4]

It is also important for this Court to note and contextualize Mr. Macartney's addiction. The sense of euphoria that Mr. Macartney received from hustling, is the same sense of euphoria he received from ingesting an opioid. Both activities gave Mr. Macartney a dopamine rush. Id at 13. This phenomenon provides important understanding as to why Mr. Macartney kicked his addiction but seemingly replaced it with his fixation on hustling.

---

[4]   https://www.youtube.com/watch?v=fx_RttkSIzA&t=2154s

Mr. Macartney can pinpoint the exact day his addiction began. He was suffering from a migraine and received an Oxycontin from his mother for the very first time back in 2002. Exhibit 4 at 8. The pill made him feel a little dizzy and euphoric, so he took a few more. Id. The number of times he would take a pill spiraled out of control and soon began taking Vicodin and Percocet. He soon began to surround himself with actors who enabled his addiction. In fact, his addiction was exacerbated by a licensed medical professional.

Around 2010, Mr. Macartney's psychiatrist at the time referred him to Dr. Tiffany Aiello. Mr. Macartney received a multitude of opioid pills from Dr. Aiello at the conclusion of his first visit. Exhibit 1 at 11. Dr. Aiello essentially became Mr. Macartney's drug dealer who supplied him with thousands of opioid pills per month until August 2011. Id.; Exhibit 4 at 9. Dr. Aiello cut off Mr. Macartney's prescriptions cold turkey by the beginning of September 2011. Id. By the end of September 2011, Mr. Macartney who was battling severe withdrawals robbed the CVS pharmacy and received his first conviction. Dr. Aiello eventually lost her medical license in 2016 for prescribing patients exorbitant amounts of opioids just as she had with Mr. Macartney.  However, the damage to Mr. Macartney had already been done.

In stark contrast to his coconspirators, Mr. Macartney and his wife have always had a deep love and respect for animals, especially their pets.  The couple could not have children on their own, so their pets have always taken on special status.  The couple lives in a small one-bedroom apartment and throughout their home are pictures of some of their closest family members, Rokki and Mschief.



Rokki was a large German Shepherd that the couple had for more than 13 years until his death in 2013.  Mischief was the couple's cat, who they also had for several years until her death in 2018.  There are pictures and mementos on nearly every wall of their small apartment.[5]  In addition, there is one area where Mr. Macartney built a memorial for his deceased father-in-law and mother-in-law.  This case contains their urns and pictures.  At the top of this case, are the urns of the Rokki and Mishcheif. [6] Michel also has a tattoo of Rokki's name on his right hand. [7]



---

[5] Exhibit 5
[6] Exhibit 6
[7] Id.

The couple still mourn the loss of their "fur babies," but have since added a new cat to their home and family.

### Cooperation with Animal Right's Activists

Several months prior to being contacted by the authorities, Mr. Macartney began cooperating with animal rights activists, Lucy Kapetanich and Dave Gooptar, who had dedicated themselves to stopping monkey torture and the production of the videos.  (*See (BBC Video 1* at 5:01 and 12:15)[8].  Mr. Macartney invited Lucy to the Telegram group, and she was able to gather a significant amount of information that she later provided to the FBI.[9] At one point, Mr. Macartney took steps to expose individuals who were engaged in the production of the videos.  (*Id. at* 29:28-30 35)[10]. Mr. Macartney advised the group that they all needed to trust each other and build a strong community, so they should all post their real picture and name in the chat. And they did.  The members talked about their children, pets, where they lived, and worked, and even shared photographs of themselves. [11]

███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

---

[8] https://www.youtube.com/watch?v=fx_RttkSIzA&t=2154s
[9] https://www.bbc.co.uk/news/extra/Iot1dIWVS5/hunting-the-monkey-torturers
[10] Id.
[11] Id.

[redacted]

[redacted]

[12] Exhibit 9

[redacted]

[redacted]

███████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████

### Post Offense Rehabilitation

Mr. Macartney asks the court to sentence him to a sentence of three years' probation, including a period of home confinement with electronic monitoring, and community service. In support of this request, Mr. Macartney asks the Court to consider the evidence of his post offense rehabilitation. Post offense rehabilitation has long been grounds for a downward departure. *See United States v. Brock*, 108 F.3d. 31 (4th Cir. 1997). Similar to the Court's consideration of post-conviction rehabilitation, the examination is necessary for the Court to properly assess the § 3553(a) factors as they exist at the time

the individual is sentenced.   *See Pepper v. United States*, 562 U.S. 476, 490 (2011) ("[A] district court may consider evidence of a defendant's rehabilitation since his prior sentencing and that such evidence may, in appropriate cases, support a downward variance from the advisory Guidelines range.").   In *Pepper*, the court reasoned:

> …..*evidence of post sentencing rehabilitation may be highly relevant to several of the § 3553(a)factors that Congress has expressly instructed district courts to consider at sentencing. For example, evidence of post sentencing rehabilitation may plainly be relevant to "the history and characteristics of the defendant." § 3553(a)(1). Such evidence may also be pertinent to "the need for the sentence imposed" to serve the general purposes of sentencing set forth in § 3553(a)(2) – in particular, to "afford adequate deterrence to criminal conduct," "protect the public from further crimes of the defendant," and "provide the defendant with needed educational or vocational training ... or other correctional treatment in the most effective manner." §§ 3553(a)(2)(B)-(D)."*
> *Id.* at 491.

Evidence of rehabilitation, if any, since the original offense, is relevant to the selection of an appropriate sentence.  Such fundamental evidence provides the most up-to-date picture of a defendant's "history and characteristics." §3553(a)(1); *United States v. Bryson*, 229 F.3d 425, 426 (2d Cir. 2000) (per curiam) ("[A] court's duty is always to sentence the defendant as he stands before the court on the day of sentencing"). There is no question that evidence of Mr. Macartney's conduct since his involvement in the offense constitutes a material part of his "history and characteristics" that Congress intended the sentencing court to consider. § 3553(a). Post-offense rehabilitation may also critically inform a sentencing judge's overarching duty under § 3553(a) to "impose a sentence sufficient, but not greater than necessary," to comply with the sentencing purposes set forth in § 3553(a)(2).

A court considering a downward departure motion based on post-offense rehabilitation can, and should, consider other factors such as employment, compliance with conditions of pre-trial release, family counseling and reconciliation, psychiatric treatment, and community and church involvement. *United States v. Rutherford*, 323 F.Supp.2d 911 (E.D. Wisc. 2004), *citing, United States v. Jones*, 233 F.Supp.2d 1067, 1071 (E.D. Wisc. 2002). Whatever the specifics, before a sentencing court may properly rely on rehabilitative efforts as a basis for a downward departure, the evidence must show that the defendant has made concrete gains in turning his life around. *Id.*

A departure for post offense rehabilitation allows "truly repentant defendants to earn reductions in their sentences based on a demonstrated commitment to repair and to rebuild their lives." *United States v. Sally*, 116 F.3d 76, 81 (3d Cir.1997). This is significant because, even though rehabilitation is no longer considered one of the purposes of imprisonment, 28 U.S.C. § 994(k), the "successful rehabilitation of a criminal [remains] a valuable achievement of the [overall] criminal process." *United States v. Core*, 125 F.3d 74, 78 (2d Cir.1997). In other words, courts want offenders to reform, for their sake and that of society; it is appropriate to provide them with an incentive to do so. A reformed offender is less likely to re-offend, thus a reduced sentence for such an offender will serve the purposes of specific deterrence and protection of the public. *See* 18 U.S.C. § 3553(a)(2). *Rutherford*, 323 F. Supp. 2d at 915.

Mr. Macartney has made significant and extraordinary efforts to turn his life completely around. In short, he's become a much better person, leaving behind the activities within his control that initially brought him before the Court.

As noted in the preceding paragraphs, Mr. Macartney has spent much of his early years making poor decisions, many of which landed him in prison for several years. He recognizes that despite the positive things in his past, he engaged in illegal and dangerous behaviors that have negatively impacted the community. The time that he spent in custody and away from his family had a significant impact on his life and he made the decision to turn his life back to who he was before and even a better person. He has worked to rehabilitate himself and become a more productive citizen and a hard worker. These changes have been noted by members of his family and close friends.

In the two years since the offense, Mr. Macartney has demonstrated a commitment to repair and rebuild his life. He has completely turned away from a criminal lifestyle and has become a more productive, law-abiding citizen. These changes are undeniable. His rehabilitation has been extraordinary and warrants a downward departure. Since being placed on conditions of release, Mr. Macartney has maintained his sobriety and followed all of the conditions of his release. [13] His performance on pre-trial supervision further demonstrates that he is a model candidate to remain in the community. Overall, he is on a positive trajectory, and he enjoys the support of a loving family and the stability that comes with sobriety and two decades of substance abuse. Sending him to prison

---

[13] Exhibit 11

now serves no one and will only make his eventual transition back into society more difficult when he is released.  Considering these facts, Mr. Macartney asks that the court sentence him to a period of probation, home confinement and community service.

Unlike many individuals who face sentencing in federal court, Mr. Macartney has the benefit of a strong, loving, and supportive family and community.  This is evident from the numerous letters that have been submitted as exhibits with this pleading.[14] Moreover, it is this level of family support that will ensure Mr. Macartney's continued rehabilitation.

The importance of family support has been highlighted in both qualitative and quantitative research efforts using a variety of samples across the United States. Existing research has shown that family support correlates with decreased recidivism,[15] increased odds of employment,[16] and better mental health outcomes[17] during reentry.  "[F]or most former prisoners, relationships with family members are critical to successful reintegration."[18]  Family members, like those in Mr. Macartney's family, provide both strong affectionate bonds (like emotional support and attachment) and important mechanisms of social support (like housing, transportation, and financial support). These

---

[14]  Exhibit 10

[15] John H. Boman, IV and Thomas J. Mowen, *Building the Ties That Bind, Breaking the Ties That Don't, Criminology & Public Policy* 16:753–74 (2017); Tracey L. Shollenberger, Urban Institute,  *When Relatives Return: Interviews with Family Members of Returning Prisoners in Houston, Texas* (2009).

[16] Mark T. Berg and Beth Huebner, Reentry and the Ties That Bind: An Examination of Social Ties, Employment and Recidivism,  *Justice Quarterly* 28:382–410 (2011)

[17] Suzanne Grieb, M.D., *et al.,* The Stress Will Kill You': Prisoner Reentry as Experienced by Family Members and the Urgent Need for Support Services, *Journal of Health Care for the Poor and Underserved* 25:1183–200 (2014).

[18] Rebecca L. Naser and Christy A. Visher, Family Members' Experiences with Incarceration and Reentry, *Western Criminology Review* 7:20–31 (2006).

are essential and can serve to reduce recidivism and promote Mr. Macartney's successful rehabilitation.

## Community Service

Mr. Macartney asks the court to impose a sentence of probation that includes and period of home confinement and community service.  "As early as 2005, the Probation and Pretrial Services Division of the Administrative Office of the US Courts encouraged judges to impose community service sentences at greater numbers as they are 'practical, cost-effective, and fair.' " *Nora V. Demleitner, Replacing Incarceration: The Need for Dramatic Change*, 22 Fed. Sent'g Rep. 1, 2 (2009).   Community service should be, among other things, reasonably related to the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. It should involve no greater deprivation of liberty than is reasonably necessary. 18 U.S.C. § 3583(d)(1).

In *United States v. Defendant*, 2018 WL 1737179, (U.S.D.C. SD NY, March 22, 2018), the court analyzed the imposition of community service through the lens of the statutory sentencing factors:

### Deterrence

*Community service is crucial in this case, in the Court's view, to help provide both specific and general deterrence. See, e.g., Garry A. Berger, Pre-Sentence Halfway House Residents: Are They Entitled to Credit Toward Subsequent Prison Sentences?, 27 Colum. J.L. & Soc. Probs. 191, 221 (1994) ("Prison incarceration is not the only form of punishment that has*

*the potential to deter potential lawbreakers. Punishments far less severe than halfway house detention fulfill the objective of deterrence; fines, professional license revocations, community service sentences, and even probation can discourage unlawful conduct.")*

### Protect the public from further crimes

*Defendant's fraud schemes, as noted, spanned several years. They impacted, among others, insurers, first responders, the public, banks, credit card users and credit card holders, the police, and debit card companies. The public at large was obviously negatively affected by Defendant's illegal actions and Defendant's (and his coconspirators') conviction(s) and sentence(s) should help protect the public going forward.*

### Provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner

*Community service is a form of correctional treatment which benefits the offender as well as the community. "When adequately resourced and carefully planned, community supervision can be an effective response to criminal behavior for both justice involved individuals and communities." Center on Sentencing and Corrections, Vera Institute of Justice, The Potential of Community Corrections to Improve Communities and Reduce Incarceration, 26 Fed. Sent'g Rep. 128, 128 (2013). Defendant's community service is performed at, which is located near Defendant's home. The community service venue ... feeds the needy and provides tax preparation, medical care, counseling, and legal services to those in need…*

*Community service provides Defendant – whose work schedule appears flexible – with an opportunity to help the community in which he lives. Fulfillment of his community service obligation requires responsibility, discipline, and prioritization on Defendant's part and requires him to consider others' needs, as well as his own. "Community service sentences recognize the damage done to individuals and communities by forcing the perpetrator to directly contribute back to society." Marti Flacks, Combining Retribution and Reconciliation: The Role of Community Service Sentencing in Transitional Justice, 1 Interdisc. J. Hum. Rts. L. 1, 4 (2006).*
*Defendant at 4-6.*

At its core, community service is a form of restorative justice.   Restorative Justice defines "justice" in a radically different way than conventional criminal justice responses. Rather than justice as "punishment," restorative justice conceives of justice as "repair" to the harm caused by crime and conflict.  As noted in the *Defendant* case, community service

is a means of repairing damage to the community. Court-ordered community service requires an offender to perform a specific number of hours of free work for a charitable agency, nonprofit organization, or governmental agency, and it can be ordered as a condition of probation or as an alternative to incarceration.

The benefits of community service are very similar to those of restitution. It can help to change an offender's values. For many, successful completion of a community service court order represents the first time they have done something, over an extended period of time, that contributed to society in a positive way. While community service does not address the needs of a specific victim, it gives offenders the opportunity to repay the community at large. In addition, the necessary monitoring and supervision associated with community service is often less expensive than incarceration.

As applied to Mr. Macartney, community service provides him the opportunity to "repair" the harm caused his crimes to the community.  He would be able to volunteer and provide services to those in need.  It would force him to directly contribute back to society.

Programs where he could complete community service include Second Chances, Youth Build and Youth Build Peacekeepers.[19] These programs are a part of Volunteers of America and provide services to "at risk" youth in Hampton Roads.  In speaking with a representative from the program, counsel learned that the programs are always looking for individuals who can come in a speak to some of the participants of the program. They

---

[19] Exhibit 7

are especially interested in convicted felons or those who have served time in prison or jails as they can speak directly and from experience to those youth who are in danger of being incarcerated or who have served sentences in the juvenile justice system.

The Portsmouth Youth Build program, which is closest to Mr. Macartney's home, provides services and training to at risk youth who are interested in being trained in certain construction related fields.  Here, Mr. Macartney could provide needed training and mentorship to those members of the community who need it most.  Through his community service, he would have the opportunity to not merely give back to his community, be also help steer a young person from the mistakes that he's made.

Mr. Macartney is uniquely qualified to reach at risk youth because of his own personal history.  Over the course of his life, he's overcome the challenges associated with growing up with an alcoholic father, being raised in poverty by a single mother, 25 years of substance abuse, prison, and other difficulties. He can speak directly to young people and relate to what many of them go through. During his probation with the state, he often served as a mentor and facilitator in various group meetings.  In addition, he took the initiative to obtain training as a "Life Coach."[20]   The skills that he's learned in this training, coupled with his life experience, can provide a service to the men and women of the program.

---

[20]    Exhibit 8,
https://www.udemy.com/course/life-coaching-online-certification-course-life-coach-training/

This kind of sentence provides the community and the court, with far greater value than a term in prison.  For these reasons, and those cited in the preceding paragraphs, Mr. Macartney asks that the court impose a sentence of probation that includes home detention and 200 hours of community service.

Mr. Macartney poses little risk of recidivism and is not a danger to the public. His performance while on pre-trial supervision has demonstrated that he poses little risk of recidivism and poses no threat to the public. See *United States v. Pyles*, 272 Fed. Appx. 258, 260 (4th. Cir 2008) ( Because Pyles had been monitored for drug use and tested negative at every screening during the six months prior to his indictment, the district court concluded that "incarceration is not necessary to protect the public from further crimes by Pyles, (18 U.S.C. § 3553(a)(2)(C)), and a sentence of probation that includes home confinement will sufficiently restrict his freedom to deter any risk of future criminal conduct. (18 U.S.C. § 3553(a)(2)(B)) Like the defendant in *Pyles*, Mr. Macartney has demonstrated that he does not need a substantial period of confinement to deter him from future crime. A sentence anywhere within the advisory guideline range would amount to excessive punishment considering the facts and circumstances of this case.

## The Need to Avoid Unwarranted Sentencing Disparity

There are very few documented cases of this type for this court to consider for disparate sentencing arguments however, there are some to note. One of Mr. Macartney's co-conspirators was recently sentenced to 48 months in case *United States v. Noble*, 6:23-cr-181-MC (D. Or. 2023). Mr. Noble was a member of the Armed Forces who was

dishonorably discharged for fraud and because he personally paid to have torture video curated and added to the group.

Another person who has been convicted of a similar crime was sentenced to a year and a day. He personally sent money to have baby monkeys abused in Indonesia in *United States v. Herrera*, Case No. 23-cr-76-wmc (W.D. Wis. 2022). In that case, Herrera sent detailed instructions to the videographer asking that the monkey be physically abused in specific violent ways. The videographer complied with these requests and sent the video to Herrera via an encrypted messaging application. In sentencing Herrera, Judge Conley remarked on the abhorrent nature of the video and pointed out that Herrera did not just view the video but played a role in its production.

In another similar case *United States v. Scott* 1:21-cr-49-SEB-DLP Krystal Cherika Scott plead guilty to two counts of animal crushing after filming herself killing five dogs, five cats, and 11 unborn kittens on social media. She was sentenced to 30 months in prison. Ms. Scott personally slaughtered 21 animals live on social media. Ms. Scott's actions were instinctually more abhorrent than Mr. Macartney's.

In *United States v. Nicole Devilbiss*, (3:23-cr-153-WWB-LL, M.D. Fla.), the defendant was sentenced to 51 months in prison.  Ms. Devilbiss funded the creation of animal crush videos using online payment applications. The evidence showed that the defendant possessed numerous videos depicting the torture of monkeys and a personal journal where she outlined her interest in obtaining a monkey locally to abuse to create additional content.

For the majority of the participants in this offense, the videos were created and viewed for some sense of sexual gratification.  Each individual, with the exception of Mr. Macartney, exhibited characteristics consistent with zoosadism.  Zoosadism is sexual pleasure derived from cruelty to animals. It is a paraphilia, where people are sexually aroused by torturing animals. [21]

Unlike his co-conspirators, Micheal was neither a zoosadist nor did he ever request videos for himself.  He has always maintained a deep respect and love for animals. However, in this case, it was his desire to make what he described as "easy money" from individuals who desired these disturbing videos.  While this does not excuse his behavior, his involvement in the offense warrants a lower sentence.

While the cases were related to Mr. Macartney's, the actions of these defendants were far more disturbing and significant. Unlike these individuals, Mr. Macartney did not gain personal or sexual gratification from the torture of animals.  These individuals did not come forward and expose the group to the non-law enforcement individuals who were investigating these crimes. Finally, the involvement of these individuals would have remained unknown for much longer, but for the actions of Mr. Macartney.

Under these circumstances, a sentence of three years' probation, including a period of home confinement with electronic monitoring, and community service will not create unwarranted sentencing disparities among similarly situated defendants.

---

[21] *"APA Dictionary of Psychology". dictionary.apa.org. Retrieved 2024-15-24.*

## CONCLUSION

Mr. Macartney accepts full responsibility for his actions. These factors, cumulatively and appropriately, reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense. A sentence of three years' probation, to include a period of home detention with electronic monitoring and 200 hours of community service is sufficient to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for Mr. Macartney's conduct. Moreover, such a sentence avoids unwarranted sentence disparity, given Mr. Macartney's history and characteristics, and other sentencing factors, and serves the mandate of § 3553(a) to impose a sentence sufficient, but not greater than necessary to punish Mr. Macartney's conduct.

Respectfully submitted,
MICHAEL MACARTNEY

By:_____/s/_____
        Rodolfo Cejas, II
        VSB No.: 27996
        Attorney for Michael Macartney
        Office of the Federal Public Defender
        500 East Main Street, Suite 500
        Norfolk, Virginia 23510
        (757) 457-0885 (telephone)
        (757) 457-0880 (facsimile)
        Rodolfo_Cejas@fd.org

        Javionté Johnson, Esq.
        New York Bar # 5720214
        Attorney for Michael Macartney
        Assistant Federal Public Defender
        Office of the Federal Public Defender
        Eastern District of Virginia

24

701 E. Broad Street, Suite 3600
Richmond, VA   23219
(804) 565-0832
(804) 800-4214 (fax)
Javionte_Johnson@fd.org

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 17th day of September 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

By: _____/s/_____
Rodolfo Cejas, II
VSB No.: 27996
Attorney for Michael Macartney
Office of the Federal Public Defender
500 East Main Street, Suite 500
Norfolk, Virginia 23510
(757) 457-0885 (telephone)
(757) 457-0880 (facsimile)
Rodolfo_Cejas@fd.org